**DONOVAN et ux. v. STANDARD OIL CO. OF LOUISIANA et al.**

**No. 6072.**

Court of Appeal of Louisiana. Second Circuit.

April 4, 1940.

Rehearing Denied May 3, 1940.

Writ of Certiorari Denied July 18, 1940.

Blanchard, Goldstein, Walker & O'Quin, of Shreveport, for appellants.

Barksdale, Bullock, Warren, Clark & Van Hook, of Shreveport, for appellees.

TALIAFERRO, Judge.

Plaintiffs, Joseph A. Donovan and wife, were injured when the Ford pick-up truck in which they were riding overturned on Highway No. 79, approximately one mile south of Homer, Louisiana. They sue to

recover damages for injuries, for loss of time, etc.

The truck at the time of the accident was being driven by a negro boy by the name of Bricely Grigsby, an employee of H. H. Jones, the operator of a service station in the town of Homer.

On the theory that both Jones and Grigsby were agents of the Standard Oil Company of Louisiana, hereinafter referred to as the oil company, and that at time of the accident Grigsby was acting within the scope of his and Jones' employment, the oil company and the carrier of its public liability insurance, the Fidelity and Casualty Company of New York, were impleaded as defendants.

Plaintiffs were riding in their own car and when five miles south of Homer on said highway, one of the tires gave way and a flat developed. They caught a ride to Homer and stopped at Jones' station and purchased a new tire. At the time, Jones was at his home for lunch. Bill Taylor, an employee, was in charge of the station and delivered the tire.

We are convinced from the testimony bearing thereon that as a concomitant of the sale, Taylor agreed to transport plaintiffs back to their own car and mount the tire. There is some dispute on the point, however.

The Jones station had no vehicle on hand to make said trip. The oil company's bulk plant adjoins the station. C. D. Edmonds is manager thereof. Taylor procured Edmonds' consent to use his truck to make the trip. The negro boy was directed by Taylor to do the driving. The accident followed.

The negligence charged to the oil company and its alleged agents is that Jones, as was his duty, did not provide plaintiffs with an experienced and competent driver; that he instructed the driver to make the trip without first ascertaining or attemping to ascertain whether said driver was competent; that said driver attempted to make a forty-five (45°) degree left curve while driving at a dangerous and reckless rate of speed, lost control of the vehicle and it turned over.

By amended petition, H. H. Jones and C. D. Edmonds were made defendants. The gravamen of the amendment reads:

"That, in the alternative, and only in the event that this Honorable Court should decide that there is no liability on the part of the Standard Oil Company of Louisiana, then petitioners allege that the truck involved in the accident described in the original petition herein was furnished by its owner, The Standard Oil Company of Louisiana, to Mr. C. D. Edmonds, a duly authorized representative of the said company, for his own use; that the said C. D. Edmonds authorized its use by Mr. H. H. Jones for the purpose of returning petitioners to their own automobile, as set forth in the original petition herein; that if the driver of the said truck was not an agent of The Standard Oil Company of Louisiana, acting within the scope and course of his employment, then he was a duly authorized agent of Messrs. C. D. Edmonds and H. H. Jones, acting within the scope and course of his employment; and, if the Standard Oil Company of Louisiana is not liable as a result of this accident, then, in that event, Messrs. H. H. Jones and C. D. Edmonds are liable in solido to petitioners for the amounts set forth in the original petition herein."

Judgment against defendants in solido is prayed for.

All defendants, after admitting that the accident happened at the time and place alleged and that the truck was owned by the oil company, denied all other essential allegations of the petitions. In the alternative, the contributory negligence of plaintiffs is pleaded as a bar to their recovery, such negligence being that they failed to maintain a proper lookout for their own safety and failed to protest against the manner of Grigsby's driving, but, on the contrary, acquiesced therein.

There was judgment for each plaintiff against all defendants in solido and they appealed suspensively.

Plaintiffs, in this court, ask that the awards in their favor be materially increased. Appellants argue that the awards are excessive.

Defendants, in brief, concede Grigsby's negligence as the primary cause of the accident, but persist in the plea of contributory negligence. They carried the burden of proving this special plea. We do not think they have discharged this burden.

A speed of forty-five (45) miles per hour on a paved highway is not invariably excessive under the law, nor is it negligence per se. Traffic and physical conditions on the highway, at all times, should

be considered by motorists in determining a prudent rate of speed at which to drive. In the present case the speed of the truck, admittedly not over forty-five (45) miles per hour, convicts the driver of negligence only in maintaining it when trying to take the sharp curve. It should have been obvious to him that a reduced speed was indispensable to safe travel on this curve.

Mrs. Donovan testified, in effect, that she protested to the negro driver that he was driving too fast. Mr. Donovan admits that he made no such complaint, but corroborates his wife as to her protest. They evidently had not left the station more than two or three minutes before the accident happened. There was little time to protest or do anything else to induce this boy to drive more carefully. The curve was probably reached before any reaction to the protest could occur. The boy denies that any protest whatever was made to him about the manner of his driving, and adds that Mr. Donovan said to him that he was in a hurry to reach Haynesville by noon. However, he does not say that either of the Donovans asked him to drive as fast as he did. The facts and circumstances being as we find them, negative the charge that plaintiffs acquiesced in this boy's negligent operation of the truck at and on the curve.

The oil company owns the service station operated by Jones. It was leased to him, and as rental, he paid one cent on each gallon of gasoline sold therein. A condition of the lease is that Jones could not handle for sale any products in competition with those manufactured and/or sold by the oil company.

Plaintiffs' contention is that Jones was simply a sales agent for the oil company on a commission basis and not an independent contractor (lessee).

Jones did not carry motor vehicle tires in stock. When a customer applied to purchase one, he would go to the oil company's bulk plant and purchase a tire of the kind and quality desired, bring it into his own station and deliver it to the customer at retail price. He would either pay cash for the tire or it would be charged to him. This course was followed in Mr. Donovan's case. The tire was not then paid for. It was carried into the station and the sale to Donovan closed. Taylor then returned to the plant to procure Edmonds' consent to use the truck to transport Donovan and wife back to their car. When asking for the truck's use, Taylor stated he wished to deliver a tire and fix a flat out on the road. Edmonds thought Taylor would drive the vehicle. He did not know that Grigsby had done so until after the accident.

All defendants admit in their answers that the truck belonged to the oil company, but Mr. Edmonds testified positively and without objection that it was his personal property and that insurance thereon was effected through the oil company. There is no testimony to contradict his on this score. However, the question of ownership, as we appreciate the legal aspect of matters, is not material.

Neither the oil company nor Edmonds was under any obligation to transport plaintiffs and the tire to their disabled car five miles away. After the tire was delivered to Taylor for Jones' account, their interest in it ceased. Edmonds had no knowledge of the identity of the purchaser of the tire nor the conditions of its sale, nor did he know, as far as the record discloses, that his truck would be used in delivering that particular tire.

In view of the above related facts, it is certain that no liability for the results of the accident rests upon Edmonds nor the oil company because of the part Edmonds had in the related antecedent facts.

The rule uniformly prevails where there is no statutory modification of it, that from the bare fact of loaning a motor vehicle by its owner to another, the relation of principal and agent is not superinduced; and, therefore, the loaning owner is not exposed to liability for damages to third persons injured while riding in the loaned car because of the negligence of its borrower or of his agent or employee. The rule is different if the borrower, to the loaning owner's knowledge, is intoxicated or otherwise incompetent to drive. Blashfield, Cyclopedia of Automobile Law and Practice, Permanent Edition, Vol. 5, § 2915; Conners v. Houma Packing Co., Inc., 12 La.App. 167, 125 So. 294; Davis v. Shaw, La.App. 142 So. 301; Zuvich v. Ballay et al., La.App., 149 So. 281; Lapeze v. O'Keefe, La.App., 158 So. 36; Monroe v. Heard et al., La.App., 168 So. 519.

It is quite clear that Edmonds simply accommodated Taylor by granting him the use of the truck as had been done on previous occasions. He knew that Taylor was an experienced automobile man and had the right to assume that no im-

**324**

proper use would be made of his truck, and that its operation on the short trip would not be committed to an incompetent person or driver.

Excepting the condition in the lease by the oil company to Jones, above mentioned, it does not appear that there was any restriction whatever upon his right to operate the service station as he saw fit. He employed his own assistants and paid their salaries from his own funds. He had the right to buy and sell any goods and merchandise not handled by the oil company and to fix the price at which all goods and products were sold. He washed and greased motor vehicles and otherwise rendered to his customers the sort of services expected and as are usually rendered in such a station.

It is clear that the oil company did not exercise any control or influence over Jones in the actual conduct of the station's business, nor did it have the right to do so. This is the essential test in determining whether the relation of master and servant or principal and agent exists or does not exist between persons bound by contractual relations.

Jones v. Pan American Petroleum Corporation et al., La.App., 190 So. 204-206, is, in some respects, analogous to the present case.

Rothrock v. Roberson et al., 214 N.C. 26, 197 S.E. 568, is in point.

Therefore, the oil company is not responsible to any extent to plaintiffs on account of any act of omission or commission by Jones or his servants.

But for the "omnibus" clause in the contract of insurance, the non-liability of the surety would be predetermined with the exoneration of the oil company from legal responsibility to plaintiffs. Under this clause the surety, in certain instances, may be held responsible to third persons in damages for physical injuries, although the named insured, the oil company, would not be liable therefor. This clause, so far as is needful here, reads as follows: "The unqualified word 'insured' wherever used includes not only the named insured but also any person while using the automobile and any person or organization legally responsible for the use thereof, * * * and provided further that the *actual use is with the permission of the named insured*. The provisions of this paragraph do not apply: * * * (c) to any person or organization, or to any

agent or employee thereof, operating * * * service station, * * * with respect to any accident arising out of the operation thereof."

Appellants contend that the omnibus coverage does not extend to plaintiffs for these reasons, viz:

(a) That as the truck was being driven by Grigsby and not Taylor, to whom loaned, its "actual use" was not by and with the permission of the named insured.

(b) That Grigsby being an employee of Jones' Service Station, injuries from his negligence are excluded from the coverage because of that employment.

██ We do not think either of these contentions well founded. It is certain that Edmonds and the oil company, through him, knew the truck was to be used on a trip to deliver a tire and fix a flat. The "actual use" of the truck for the purposes named was with the "permission of the named insured." This provision relates only to the use of the vehicle, not to the identity of the person actually driving it. The truck was, in fact, being used for the purpose for which borrowed. Such use being lawful, the ultimate legal situation is the same as if Edmonds had been driving it when the accident occurred. This clause was incorporated in the contract out of an abundance of precaution to the end that liability under the coverage could not possibly be extended to cases of use not definitely by and with the consent of the named insured. Parks v. Hall et al., 189 La. 849, 181 So. 191. Monroe v. Heard, supra, cited and relied on by appellants, is not pertinent.

█ Under the limitations of the omnibus coverage, neither Grigsby nor any other employee of the service station could hold the surety responsible for damages to him or them flowing from "any accident arising out of the operation" of the truck. But, it is clear to us that this restriction was not intended to apply and does not apply to persons lawfully riding in the vehicle when being used with the named insured's permission. Parks v. Hall et al., supra. This restriction applies only to persons or organizations, or agents or employees thereof, operating service stations, etc. To construe this provision as appellants contend, would largely destroy the comprehensive

character of the protection evident from its unambiguous language. Such a construction would virtually mean that no person using or riding in a motor vehicle of a service station would, if injured while so doing, have recourse for damages against the surety. It would lead to absurd and unreasonable consequences.

It is argued that Jones is not responsible for Grigsby's negligence because he had forbidden him to drive his vehicles, and that Grigsby acted without the scope of his employment in making the trip with plaintiffs; that Taylor, an employee only, was without authority to require Grigsby to make the trip as Jones' agent. We think this position well taken.

Grigsby was employed by Jones the day of the accident. About mid-morning of that day, Jones had a call to render aid to a car without the town of Homer and Grigsby volunteered to make the trip for him. Jones forbade him to do so, stating that he never allowed negro employees to drive his motor vehicles. Grigsby corroborates Jones as to this statement. Taylor was not asked if he knew of this rule of his employer. As he had worked for Jones for four years, it is safe to assume that he did have knowledge of the rule. He had no right to violate it and in so doing impliedly assumed personal responsibility for the results.

A rule of the character discussed is a prudent and a reasonable one. It was adopted evidently out of an abundance of caution against exposure to liability for the negligence of incompetent and careless employees. No one had the right to ignore it without Jones' positive assent; and when Taylor and Grigsby did ignore the rule, each of them acted beyond the scope of their power and employment. If such a rule could be nullified by employees during the absence of the employer, so as to expose him to liability for consequences that might follow the breach, it would be vain and idle to adopt it. The employer, if this were true, would be helpless to protect himself against the unauthorized acts of his employees. Such is not the law.

Immediately after the accident, plaintiffs were picked up by a passing car and carried to a physician in Homer who administered first aid. After the lapse of three or four hours they were taken to Shreveport and placed in a sanitarium.

At Homer it was found that both were in a state of shock, nervous, and suffering from pain. Mr. Donovan experienced difficulty in breathing. This condition, however, improved materially before he left for Shreveport. Hypodermics of morphine were given to each of them.

Mrs. Donovan, when injured, was thirty-eight years old. She received slight cuts on the lip and on one cheek. These were not deep enough to require suturing. At the date of trial each cut had entirely healed and there is no permanent disfigurement. She lost three false teeth and a bridge costing ninety ($90) dollars. Her face was swollen and one eye was black from bruising. She was in the sanitarium seven days and was confined to bed two weeks after returning home. Her physician testified that she quit the bed as soon as he ceased treating her. She is normally of a nervous temperament and the effect of the accident aggravated this condition. Many hypodermics were given to quiet her while at the sanitarium and at home. She suffered considerable pain intermittently, but at the time of trial had completely recovered from the ill effects of the accident. The lower court awarded her five hundred ($500) dollars for injuries, pain, etc. This appears to be adequate.

Mr. Donovan was forty-seven years old at time of accident. He was badly jarred, was slightly bruised on the chest, left arm and right side of face. Quite a bit of soreness resulted. However, no bones were injured. He was also a patient at the sanitarium for seven days and suffered some pain. The treatment administered to him was practically the same as was given his wife. He was able to resume work as a plumber, his trade, the latter part of February, following the accident on December 5th. The most serious injury he claims to have sustained as a consequence of the accident is a hernia. At the date of trial, excepting the asserted hernial condition, he had fully recovered from all the effects of the original injuries.

Plaintiffs' family physician, who treated them while in the sanitarium, frankly testified that both exaggerated the extent and seriousness of their pain and suffering.

Whether Donovan has a hernia, and if so, whether it developed from and is

an aftermath of the accident, are debatable questions under the testimony. The medical testimony pertinent thereto, as so often lamentably happens, is in direct conflict. Physicians for plaintiff are quite sure that a potential hernia is present, while physicians of equal credibility, seasoned by many years of practical experience, are equally positive that plaintiff has no hernia. We do not think it proven, admitting that he is now. afflicted with a potential hernia, of which there is serious doubt, that the accident is responsible for its existence. Some significant facts, aside from the medical testimony, illuminate the question.

Hernia may result from trauma, but more often from other causes. Donovan is a plumber by trade, the duties of which require much physical effort and at times straining and lifting heavy objects. Most hernias are produced from physical efforts of this character.

■ It is common knowledge that many people have potential hernia for years and are ignorant of the fact. They continue, without discomfort, to perform their regular work, though it be heavy. They generally develop gradually and the condition enlarges imperceptively and without the knowledge of the person. If a hernia is produced suddenly, it is almost invariably accompanied with pain and a burning sensation.

Donovan did not complain of any pain in the hernial region when in the doctor's office in Homer. Neither did he complain of such while in the sanitarium. It was approximately six weeks before he decided that the hernia was present and then consulted a physician.

Physicians for defendants testified that a majority of the football players of Centenary College, upon physical examination, were found to have hernial symptoms developed to the extent as that found in Donovan; such symptoms simply being slight enlargement of the right inguinal rings.

■ No good purpose would be promoted by an epitome of the conflicting medical testimony. We have studied it carefully and arise from our labors convinced that plaintiff has not made out his case on the issue of the hernia.

■ For pain, shock, etc., Donovan is entitled to the same amount as was awarded to his wife,—$500. The expenses for treating himself and wife aggregated $254.50. He lost eleven weeks from work and was earning $55 per week, an aggregate of $605. Cost of new denture for his wife was $100, making a total of $1,459.50. He is entitled to judgment for this amount.

For the reasons herein assigned, the judgment appealed from, in so far as it condemns the Standard Oil Company of Louisiana, C. D. Edmonds and H. H. Jones for payment thereof, is reversed, annulled and set aside, and the suit, so far as concerns them, is hereby dismissed. And for said reasons, the judgment in favor of Mrs. Donovan and against the Fidelity and Casualty Insurance Company of New York is affirmed, and that in favor of Mr. Donovan against said surety is reduced from $3,428.50 to $1,459.50, and, as thus reduced and amended, the judgment in his favor is affirmed. The Fidelity and Casualty Insurance Company of New York is cast for all costs.